

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

05 AUG -1  PM 4: 06

CLERK ALBUQUERQUE

**CIV - 0 5 -  8 2 9  JP  RLP**

JONATHAN CROWELL, Individually and
On Behalf of All Others Similarly Situated,

                Plaintiff,

    v.

MANNATECH, INC. and SAMUEL L.
CASTER,

              Defendants.

No.

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS

**JURY TRIAL DEMANDED**

Plaintiff Jonathan Crowell ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

following based upon personal knowledge as to Plaintiff and his own acts, and on information

and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and

through Plaintiff's attorneys, which included, among other things, a review of the defendants'

public documents, public announcements made by defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding

Mannatech, Inc. ("Mannatech" or the "Company") and information readily obtainable on the

Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

### SUMMARY OF ACTION

1.    This is a securities class action on behalf of public investors who purchased the

securities of Mannatech between August 10, 2004 and May 8, 2005, inclusive (the "Class Period"), against Mannatech and certain of its executive officers for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.       Defendant Mannatech, Inc. operates in the field of "glyconutrients" and designs and develops proprietary nutritional supplements, topical products and weight-management products sold primarily through a network-marketing system -- commonly known as "multilevel marketing."

3.       Defendant Samuel Caster ("Caster") is one of Mannatech's founders and during the Class Period served as the Company's Chairman and Chief Executive Officer.  According to a May 9, 2005, article published by *Barron's*, Defendant Caster previously headed Eagle Shield, a Texas-based multilevel marketing company. According to *Barron's*, in 1988 Eagle Shield and Caster agreed to a permanent injunction concerning misleading claims made about the company's Radiant Barrier home-insulation product.  Moreover, in 1991 in response to an action filed by the Texas Attorney General, Caster and his company agreed to the entry of a judgment against them and admitted that another product, an electronic pest control device, simply did not work as represented.

4.       Mannatech products are subject to the provisions of a variety of state and federal statutes and regulations, including the Federal Food, Drug and Cosmetic Act and the Dietary Supplement Health and Education Act of 1994, which states in part that dietary supplements

2

"may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases." 21 U.S.C. 343(r). Mannatech acknowledges in its 2004 Form 10-K that "[a] majority of Mannatech's products are considered dietary supplements as outlined in the Federal Food, Drug and Cosmetic Act."

5.     Mannatech's multilevel marketing structure comprises purportedly independent sales associates and members. Mannatech associates who recruit other sales associates are able to earn income from their own sales of Mannatech products and also receive a percentage of the income resulting from the sales of the associates' "downline" organization of recruits.

6.     Certain Mannatech associates operate and maintain their own websites which offer Mannatech products for sale and commonly include, among other things, articles and supportive research concerning glyconutrients, user testimonials, media reports about Mannatech and glyconutrients, links to the Company's corporate website, and information about how to become a Mannatech associate.

7.     During the Class Period, defendants made materially false and misleading statements concerning the Company's business and operations. Specifically, Mannatech failed to adequately supervise and/or monitor the conduct of its associates, including those who maintain websites that prominently display misleading testimonials and/or falsely suggest that Mannatech products are effective in the treatment and prevention of specific diseases including cancer, diabetes and multiple sclerosis, among others.  These false and misleading claims violate the

3

Dietary Supplement Health and Education Act, as well as Mannatech's own Policies &
Procedures for associates.

8.    Unbeknownst to public investors, the true facts, which defendants knew and/or
recklessly disregarded and failed to disclose to the investing public during the Class Period,
included: (i) that the Company's internal controls were inadequate, and failed in several key
aspects, resulting in inadequate monitoring and supervision of the Company's associates; (ii) as a
consequence of defendants' failure to supervise, Mannatech associates made false and unfounded
claims concerning the efficacy and health benefits of the Company's products; and (iii) as a result,
defendants' statements with respect to Mannatech's operations, performance and prospects were
lacking in any reasonable basis when made. As a result of the defendants' materially false and
misleading statements concerning the efficacy of Mannatech products, Mannatech's stock price
traded at inflated levels during the Class Period.

5.    On May 9, 2005, the *Barron's* article revealed the misleading nature of the claims
made on certain Mannatech associates' websites. This new shocked the market, causing the price
of Mannatech shares to plummet more than 26 percent in one day, thereby damaging investors.
The next day, May 10, 2005, Mannatech shares fell an additional 19 percent as a result of this
news.

4

## JURISDICTION AND VENUE

6.     The claims asserted arise under "10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"). Jurisdiction is conferred by '27 of the 1934 Act. Venue is proper pursuant to '27 of the 1934 Act as defendant Mannatech and/or the individual defendant conduct business in and the wrongful conduct took place in this District.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

8.     Plaintiff Jonathan Crowell purchased Mannatech publicly traded securities as detailed in the attached Certification and was damaged thereby.

9.     Defendant Mannatech designs and develops proprietary nutritional supplements, topical products, and weight-management products. Operating in the field of "glyconutrients," Mannatech's products purportedly are designed to support, among other things, cell-to-cell communication, the immune system, the endocrine system, healthy skin, and optimal health. The Company primarily sells its products through a network-marketing system comprising independent associates and members in the United States, Canada, Australia, the United Kingdom, Japan, New Zealand and the Republic of Korea.

5

10.     Defendant Samuel L. Caster is a co-founder of Mannatech and, at all times relevant hereto, was Chairman and Chief Executive Officer and a member of the Company's Science Committee.

11.     Defendant Caster is sometimes referred to herein as the 'Individual Defendant."

12.     Because of the Individual Defendant's positions with the Company, he had access to the adverse undisclosed information about Mannatech's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith.

13.     The Individual Defendant, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendant was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were

6

being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.    As an officer and controlling person of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and traded on the Nasdaq National Market ("Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendant had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendant's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.    The Individual Defendant participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and was aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature. Because of his Board membership and/or executive and managerial positions with Mannatech, the Individual Defendant had access to the adverse undisclosed information about Mannatech's business operations as particularized herein and knew (or recklessly disregarded) that these adverse facts

7

rendered the positive representations made by or about Mannatech and its business issued or adopted by the Company materially false and misleading.

16. The Individual Defendant, because of his positions of control and authority as an officer and director of the Company, was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendant is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17. The Individual Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Mannatech securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Mannatech's business, operations, management and the intrinsic value of Mannatech securities; and (iii) caused plaintiff and other members of the Class to purchase Mannatech securities at artificially inflated prices.

**CLASS ACTION ALLEGATIONS**

18. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

8

acquired the common stock of Mannatech between August 10. 2004 and March 9, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is imprac-
ticable. Throughout the Class Period, Mannatech's common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery. Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mannatech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

9

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mannatech; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

(d)     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Mannatech, Inc. operates in the field of "glyconutrients" and designs and develops proprietary nutritional supplements, topical products and weight-management products based on the belief that specific carbohydrates, antioxidants, and other nutrients not typically found in sufficient quantities in modern diets, are essential to maintain optimal health and wellness. Specifically, the Company claims that eight sugar molecules play an essential role in cell-to-cell communication. Mannatech's flagship product B Ambrotose Complex B is an aloe-vera-based compound , a key component in all but one of Mannatech's products, and formulated to provide the body with certain of these eight sugars. The Company states that its products "are designed to support cell-to-cell communication, the immune system, the endocrine system, healthy skin, and optimal health, as well as nutritional support during beneficial weight loss."

24.     Mannatech products are primarily sold through a network-marketing system commonly known as "multilevel marketing," comprising Mannatech's purportedly independent sales associates and members. Thus, Mannatech associates are able to earn income from their own sales of Mannatech products and also receive a percentage of the income resulting from the sales of the associates' "downline" organization of recruits.

25.     Mannatech's co-founder and CEO, defendant Samuel Caster, is a veteran of multilevel marketing ventures. He previously headed Eagle Shield, another Texas-based multilevel

11

marketing company. According to a May 9, 2005, article published by *Barron's*, in 1988 in response to an action filed by the Texas Attorney General, Caster and his company agreed to a permanent injunction concerning misleading claims made about the development of the company's home- insulation product and its ability to lower customers' utility bills; in 1991, again in response to an action filed by the Texas Attorney General, Caster admitted that another product B an electronic pest control device B did not work as represented.

26.    Mannatech claims to actively supervise and monitor its associates' conduct. For example, the Company's S-1 Registration Statement, filed May 13, 1999, in connection with the Company's initial public offering, represents that the Company "take[s] an active role in the management of our associates," and claims to "seek to restrict the statements and conduct of associates regarding our business by contractually binding associates to abide by our associate policies and procedures." The Form S-1 further states that "Associates are also prohibited from creating any marketing literature that has not been approved by Mannatech or a qualified attorney. We also monitor associate websites and Internet conduct on a regular and continuing basis." *Mannatech Form S-1, filed May 13, 1999, at 47.*

27.    Mannatech's Form S-1 also represents that the Company "ha[s] established, and enforce[s] as much as possible, a compliance program for disciplining associates who do not comply with our policies and procedures." *Id. at 48*. Additionally, the Company claims to routinely monitor its associates conduct: "[O]ur compliance and legal departments, in cooperation

with our other departments, regularly evaluate associate conduct and the need for new and revised

rule making." *Id.*

28.     Moreover, Mannatech's 2004 Form 10-K, filed March 31, 2005 with the SEC,

claims that "Mannatech takes an active role in the oversight of its independent associates," and

that the Company maintains a compliance program to regulate its associates' sales activities.

Mannatech's 2004 Form 10-K describes the Company's disciplinary procedure as follows:

> Mannatech's legal/compliance program also depends on its independent
> associates to self-regulate by providing a standardized complaint process. When a
> complaint is filed against an independent associate, Mannatech's legal/compliance
> department conducts an investigation of the allegations by obtaining a written
> response from the independent associate and witness statements, if applicable.
> Depending on the nature of the violation, Mannatech may suspend and/or
> terminate the non-compliant associates' agreement and/or may impose various
> sanctions, including written warnings, probation, withholding commissions, and
> termination of associate status. Mannatech's legal/compliance department, in
> cooperation with other departments and associates, periodically evaluates the
> conduct of its independent associates and the need for new and/or revised policies
> and procedures. Mannatech's legal/compliance program assists in maintaining
> high ethical standards among its independent associates, which helps its
> independent associates in their sales efforts. Mannatech also sponsors continuing
> education to ensure that its independent associates understand and abide by
> Mannatech's associate policies and procedures.

29.     In addition to a description of Mannatech's enforcement of its internal policies,

the 2004 Form 10-K further states that "Mannatech has procedures in place to help ensure that

its independent associates and employees comply with the requirements of DSHEA [the Dietary

Supplement Health and Education Act of 1994], the Food, Drug and Cosmetic Act, and various

other regulations."

29.     Mannatech also assists its associates with personalized website development, and provides Company-approved advertisements and sales materials for associates' use. In fact, the Company's Code of Ethics states that associates are strictly prohibited from using sales materials which are not Company-approved, with violations of this policy subject to the Company's "Compliance Disciplinary Procedure."

30.     Despite these asserted policies and procedures, Mannatech associate websites include testimonials and claims that allude to the Company and its products, by linking the use of glyconutrients with the prevention, treatment and cure of various diseases and afflictions including, but not limited to, cancer, diabetes, arthritis, asthma, hypertension, cerebral palsy, cystic fibrosis, multiple sclerosis, Tay-Sachs Disease, Down syndrome, hepatitis and others.

31.     For example, a website maintained by Mannatech associate Jenerik Enterprises[1] displays a magazine article titled "Back from the Brink," published in the April 21, 2001, *Las Vegas Review-Journal*. The article describes the experience of Greg Letourneau, identified on the website as a 44-year-old man diagnosed with Toxic Shock Syndrome who was near death until his doctors administered glyconutrients. The article describes Letourneau's illness and subsequent "remarkable" recovery, stating in part as follows:

> The illness is caused by the same bacteria that causes strep throat. If a strep infection isn't treated in a timely fashion, it can, as in Letourneau's case, infect the blood causing TSS.

[1] www.jenerik.com

14

A little more than a day after being admitted to the hospital, Letourneau's arms and legs were blue and cold and had no pulses, which meant they weren't receiving blood flow.

Schlachter worked to keep Letourneau alive as his temperature soared to 107 degrees and his blood pressure plummeted to dangerously low readings.

**"In my experience, when patients get to that point they don't survive," Schlachter said. "I looked at all the evidence and said, 'This patient is going to die.' There was basically no hope. He was maxed out on every med we could give him."**

Stenberg sat by her brother's side through the whole ordeal waiting for doctors to help him. But nine other doctors consulted with Schlachter and all gave up hope for his recovery.

"The doctor came in and said, 'If you've got family you'd better get them,' " Stenberg said, fresh tears running down her face. Stenberg called a priest to give her brother last rites. "Ten doctors came to me and said he was going to die. I said, 'He can't die, he's only 44. Please do something.' "

Luckily, Schlachter had an ace up his sleeve, something he could try but not make any promises about: glyconutrition.

**Six hours after administering the first dose of glyconutrition, the color began to return to Letourneau's limbs. It was several days before his life was out of danger and seven weeks before he was released from the hospital, but his recovery has amazed Schlachter, who plans to write a journal article about the case.**

"I've never seen it before, let alone heard of it," Schlachter said. "The whole thing is remarkable."

Looking at Letourneau now, with his athletic frame, tanned skin and overall appearance of good health and vitality, it's hard to believe he was all but dead six months ago.

\* \* \*

[Emphasis added.]

15

32.     Another Mannatech associate website. GlycoStory.com, also displays

Letourneau's story as well as an audio link to another testimonial concerning a lifelong allergy

suffer who was "essentially allergy free" after only three months of glyconutrient therapy.

Although Mannatech products are not mentioned by name on the GlycoStory website, the

website's "Products" link sends online visitors to GlycoScience.org, a website maintained by

defendant Mannatech.

33.     Similarly, the website for GlycoLife Neutraceuticals[2] offers only Mannatech

products for sale and provides testimonials concerning sufferers of cancer, multiple sclerosis and

other debilitating and potentially life-threatening diseases purportedly remedied through

glyconutrient use. The GlycoLife Neutraceuticals website also provides links to Mannatech's

GlycoScience.org website and to GlycoStory.com. The following testimonials appearing on the

GlycoLife Neutraceuticals website also appear in various forms on other Mannatech associates'

websites, featuring these same patients:

> **Michelle Desrochers**
> Two years ago Michelle was a typical 10-year-old child with Down syndrome,
> attention deficit, always sick and hospitalized many times due to severe asthma
> attacks. Her life consisted of the nebulizer, antibiotics and steroids. **That daily
> medical regime is no longer a part of her life since her parents, Barbara
> and Jacques, began giving her the glyconutritional product from
> Mannatech. ...**

---

[2]www.glycolife.com

16

Today, Michelle is a typical "middle school pre-teen." She participates in P.E. (even on windy, hi-pollen days), is an honor student, and hasn't had an asthma attack for over a year and a half.

**"[W]e and others have noticed that the facial features associated with Down syndrome have become less pronounced, a side benefit we didn't expect."** [Emphasis added.]

**Garleen Cooper**

Cancer took the lives of her loved ones, and it seemed as if Garleen's skin cancer was going to kill her too. **A picture is worth a thousand words when you see how Glyconutrients gave this woman her life back. The skin cancer has disappeared** and Garleen's self image has improved at least a million percent! Everyone can benefit from this breakthrough technology. Start today and plan to be healthy for life! [Emphasis added.]

**Jaclyn**

Shortly after being married, Jaclyn was faced with the greatest challenge of her life. The excitement of being a newlywed was soon drowned out by the confinement to a wheelchair. Jaclyn's [Multiple Sclerosis] had beaten her, at least for the time being. **A friend introduced her to Glyconutrients, so Jaclyn agreed to give them a try. To everyone's amazement, Jaclyn became the fastest response to Glyconutrients of anyone who has tried them with MS. The restoration of health usually takes several months with such a debilitating condition. For Jaclyn, within two weeks she was walking again. Truly a miracle!**

[Emphasis added.]

## False And Misleading Statements Issued During The Class Period

34.    The Class Period begins on August 10, 2004. On that day, Mannatech issued a press release announcing the Company's financial results for the second quarter ended June 30, 2004. The press release, titled "Mannatech Announces Record Quarterly Sales, Net Income and E.P.S.," stated, in pertinent part, as follows:

17

COPPELL, Texas--(BUSINESS WIRE)--Aug. 10, 2004 Mannatech, Incorporated (Nasdaq:MTEX) today announced record sales and net income for its second quarter ended June 30, 2004. For the three months ended June 30, 2004, net sales reached $74.3 million, which was an increase of 59.8% from $46.5 million for the same period in 2003 and net income increased by 376.1% to $5.6 million or $0.20 earnings per share (diluted), as compared to $1.2 million or $0.04 earnings per share (diluted) for the same period in 2003. For the first six months of 2004, net sales increased by 52.5% to reach $132.7 million and net income increased to $8.7 million, or $0.32 earnings per share (diluted), compared to sales of $87.0 million and net income of $2.6 million, or $0.10 earnings per share (diluted) for the same period in 2003. ...

* * *

Commenting on the results, Mannatech Chairman and CEO Sam Caster said, "Our record performance, with sales growth of 59.8% and net income increasing 376.1%, is a testament to Mannatech's products, our Associates and the future of the Company. Along with this tremendous growth in our current markets, we are excited about introducing Mannatech products to South Korea when we plan to open for business in September 2004. Another sign of our strong trend is our increase in pack sales, which increased by 101.8% in the second quarter of 2004 as compared to 2003. Pack sales, which are regarded as a leading indicator for Mannatech, include signups, renewals, and upgrades, and our higher priced pack choices include various product selections as well as sales materials. New Associates are joining our company at a record rate, and we look forward to adding South Korea to our family of markets."

35.     That same day, August 10, 2004, Mannatech's financial results for the second quarter of 2004, the period ending June 30, 2004, were repeated in the Company's Form 10-Q filed with the SEC and signed by defendant Caster.

36.     On November 9, 2004, Mannatech issued a press release announcing the Company's financial results for the third quarter ended September 30, 2004. The press release,

18

titled "Mannatech, Inc. Announces Record Quarterly Sales & Earnings," stated, in pertinent part,

as follows:

> COPPELL. Texas--(BUSINESS WIRE)--Nov. 9, 2004
> Mannatech, Incorporated (Nasdaq:MTEX) today announced record sales and earnings for its third quarter ended September 30, 2004 as compared to the same period in 2003. For the three month period ended September 30, 2004, sales reached $77.6 million, a new quarterly sales record for Mannatech, which was an increase of $27.8 million, or 56.1%, as compared to the prior year. Net income rose to $6.8 million, which more than doubled versus the same period in 2003. Net income as a percentage of net sales increased to 8.8% of net sales as compared to 5.8% for the same period in 2003. Earnings per share (diluted) for the third quarter of 2004 increased to $0.25 per share, which was an increase of 127.3% as compared to the prior year.
>
> Sales for the nine months ended September 30, 2004 were $210.2 million, up 53.8% versus 2003. Net Income reached $15.5 million, which was an increase of $10.0 million or 183.4% over last year, while earnings per share (diluted) for the nine months ended September 30, 2004 was $0.57, again of 171.4% as compared to the same period in 2003.
>
> The third quarter results represented a new quarterly record and marks Mannatech's eighth consecutive quarter of successive sales increases, during which time sales have more than doubled. ...
>
>                     * * *
>
> Sam Caster. Chairman and CEO of Mannatech, commented on the records setting results. "We have seen our business grow rapidly and successfully for the past eight quarters, through the tremendous labors of our Associates around the world in concert with the highly focused and motivated activities of our corporate staff. We have also seen our sales double since the string of successive quarterly increases began in the fourth quarter of 2002. This strong trend is rewarding to us, and yet we believe that we have just begun to realize the potential of the products Mannatech brings to the world. We intend to continue our growth into new markets around the globe, and we welcome into the Mannatech family the Associates in our newest market in South Korea, which opened in September. 2004."

19

37.    That same day. November 9, 2004, Mannatech's financial results for the third

quarter of 2004, the period ending September 30, 2004, were repeated in the Company's Form

10-Q filed with the SEC and signed by defendant Caster.

38.    On March 9, 2005, Mannatech issued a press release announcing the Company's

financial results for fourth-quarter and full-year 2004. The press release, titled "Mannatech Inc.

Announces Another Record-Breaking Year of Annual Sales & Profit," stated in pertinent part as

follows:

> Mannatech Inc. Announces Another Record-Breaking Year of Annual Sales &
> Profit
>
> COPPELL. Texas--(BUSINESS WIRE)--March 9, 2005
> Mannatech, Incorporated (Nasdaq:MTEX) today announced the achievement of
> new annual sales and profit records for 2004. Consolidated net sales reached a
> new high of $294.5 million, an increase of $103.5 million, or 54.2%, as compared
> to 2003. Mannatech's net income of $19.6 million more than doubled as
> compared to the prior year with an increase of $10.8 million, or 122.4%, and
> earnings per share of $0.71 (diluted) increased 108.8% as compared to 2003. ...
>
> * * *
>
> Fourth quarter results also included a new consolidated net sales record of
> $84.2 million for Mannatech, which was an increase of $29.9 million, or 55.1%,
> as compared to the same period in 2003. Fourth quarter net income was $4.0
> million, or $0.15 earnings per share (diluted), which was an increase of 21.9 %
> over the fourth quarter of 2003. Net income for the fourth quarter included
> one-time non-cash charge, totaling $3.0 million, or $0.07 per diluted share, net of
> tax, related to Mr. Caster's sale of 180,000 shares of his common stock to a
> former employee, Dr. H. Reginald McDaniel. The sale was for a price that was
> below the fair market value of Mannatech's stock on the date of the sale. ...
>
> * * *
>
> Mr. Caster commented on the new all time high record sales volumes for the
> periods, stating. "We are extremely pleased with the financial gains and continued

20

strength shown throughout 2004, and also are delighted with the impressive sales momentum generated by our 369,000 current independent Associates and members around the world. Our groundbreaking glyconutritional technology continues to bring hope, health, and opportunity to people in record numbers and we believe that we are just scratching the surface of the potential of Mannatech."

39.    On March 31, 2005, Mannatech filed its annual report with the SEC on Form 10-K for the period ended December 31, 2004. The 10-K was signed by defendant Caster, among others, and reaffirmed the Company's previously announced financial results.

40.    Defendants' knew or recklessly disregarded that their statements described in ¶¶34-39, above, were materially false and misleading when made because defendants misrepresented and/or failed to disclose material adverse facts about Mannatech: Unbeknownst to public investors, the true facts, which defendants knew and/or recklessly disregarded and failed to disclose to the investing public during the Class Period, included: (i) that the Company's internal controls were inadequate, and failed in several key aspects, resulting in inadequate monitoring and supervision of the Company's associates; (ii) as a consequence of defendants' failure to supervise, certain of the Company's associates made false and unfounded claims concerning the efficacy and health benefits of Mannatech products; and (iii) as a result, defendants' statements with respect to Mannatech's operations, performance and prospects were lacking in any reasonable basis when made.

21

## Disclosures at the End of the Class Period

41.     On May 9, 2005, an article published by *Barron's* described the Company's

business operations, as well as the therapeutic claims made on certain Mannatech associates'

websites for a variety of diseases, including cancer, arthritis, diabetes, cystic fibrosis and other

diseases. The article, titled "Manna from Texas," referred to some of the same testimonials

described in ¶¶30-33 above, and stated the following:

> Manna From Texas
> By RHONDA BRAMMER
> IN TEXAS, EVEN SMALL-CAPS have 10-gallon ambitions. A case very much in
> point: Mannatech. A relatively new company that went public six years ago, it
> operates in a kind of tributary -- backwater might be even more apt -- of the
> health-care industry. Yet while it may be obscure -- not a single analyst follows it
> -- the company boasts a solid balance sheet and soaring earnings, enjoys high
> returns on capital and throws off slugs of cash. Lucky shareholders certainly have
> no complaint: Its stock has rocketed from under $2 in 2003 to a recent high of
> $26. At Friday's close of $20 and change, the company sports a stock-market
> value of $550 million.
>
> Already growing at a blistering pace -- sales last year hit $295 million, up from
> $191 million the year before and $141 million in '02 -- the company, from its base
> in Coppell, Texas, is busily stepping up expansion of its budding empire, not only
> in the U.S., but in foreign markets, as well. Some 35% of revenues last year came
> from operations in Australia, Japan, Canada, New Zealand and the U.K. In
> September, Mannatech branched out into Korea, and it will enter Taiwan next
> month.
>
> The fuel for Mannatech's explosive growth is no high-tech breakthrough or
> merchandising innovation, but, rather, a line of nutritional supplements, called
> glyconutrients. These supplements supply carbohydrates, or sugars, the company
> claims are necessary for optimal health and not found in adequate amounts in
> modern diets. Mannatech also offers skin-care and weight-management products.
>
> Most Mannatech products include Ambrotose Complex.

Last year Mannatech earned $19.6 million, or 71 cents a share, more than twice the 34 cents it netted in 2003. Book value weighs in at only about $2 a share, but some $1.60 of it is cash, and the company has barely a speck of long-term debt.

Because Mannatech outsources the manufacturing of its supplements, it can sharply boost sales with little or no investment simply by adding more sales people, virtually all of them independent contractors. Which is why it enjoys truly outsize returns on capital: In 2004, return on equity came in at a formidable 44%.

**But for all the surface flash, eye-popping financials and grand plans, Mannatech's allure steadily dims the more intensely one scrutinizes its provenance and how it makes its living.**

**More specifically, our skepticism grew as we examined the company's multilevel marketing structure, reviewed some of the extravagant claims of its sales people both here and abroad, and perused the complaints of the Texas attorney general's office about an earlier venture of Mannatech's chief exec, Samuel Caster.**

A lot of the concerns sparked by our research into the company and its affairs find dramatic expression in a civil suit, filed in Los Angeles Superior Court, charging Mannatech and Caster with, among other things, "negligent misrepresentation" and "conspiracy to commit fraud." The company, let us hasten to add, denies all the allegations in that case and avers it deals severely with any misconduct by its sales associates.

Mannatech went public in February 1999 at $8. In the first days of trading, the stock ran wild, hitting an intraday high of $44.50. From there on, however, it was virtually all downhill. By May '01, shares were trading under $1, and for the next two years, they never got above $4 and change.

From the get-go, Mannatech's strategy has been two-pronged: to develop a proprietary line of supplements and a multilevel marketing organization to sell them. The hallmark of its multilevel marketing is that salespeople, called "associates," earn money not only by selling supplements, but also by recruiting other associates to sell supplements, who, in turn, are encouraged to recruit still more salespeople. In this fashion, the original associate builds what is called a

23

downline network and, importantly, gets a financial cut from not only his own sales, but the sales of his entire network.

This is not Caster's first multilevel marketing venture. In the late 1980s, he headed up just such an enterprise, Eagle Shield, that was the source of run-ins with the consumer-protection division of the Texas attorney general's office.

Eagle Shield's initial product -- based, the company claimed, on a new technology invented by the National Aeronautics and Space Administration -- was insulation for homes that bore the label Radiant Barrier and could, the company boasted, slash a consumer's utility bills by 18% to 40%.

In sharp disagreement, the attorney general's office maintained that the technology long predated NASA -- in fact, had been around since the 1940s -- and didn't work as advertised. In August 1988, Eagle Shield and Caster agreed, without admitting or denying wrongdoing, to a permanent injunction requiring them to prominently disclose they had no ties to NASA and to not claim Radiant Barrier cut utility bills by more than 3% to 8%.

In January 1991, the Texas AG's office was again stirred to action. This time the focus of its displeasure was the ElectroCat, a device that emitted "pulsed" vibrations and could, according to the company, rid farms and homes "of roaches, spiders, crickets, fleas, ticks, ants, mice, rats, gophers, moles, snakes and scorpions."

Baloney, said the attorney general's office, noting that the ElectroCat emitted "no measurable vibrations, pulsed or otherwise," and had no measurable effect on mice or bugs. "The device is a hoax," the AG declared, "and stands on the same scientific footing as a perpetual motion machine."

On Jan. 24, 1991, Caster and his multilevel marketing company agreed to the entry of a judgment against them and admitted that the ElectroCat, flat out, didn't work.

Asked about his difficulties with the Texas attorney general, Caster is philosophical. "It taught us how to appropriately validate claims," he responds. "It was a very good lesson in life."

24

Undaunted, Caster tried again and hit it big with Mannatech. Not the least of reasons for its success is that a whopping amount of Mannatech's business gets done over the Internet. Associates can both sell supplements and sign up recruits on-line. Going into biz takes nothing more than a home computer on the kitchen table. Importantly, Mannatech helps associates design Websites and offers to ship supplements directly to customers, all the while keeping track of an associate's commissions. What's more, an associate can monitor his whole downline network -- see who's drumming up business and who's not -- via computer.

The company's stock-in-trade supplements, often referred to by associates simply as glyconutrients, are based on something called Ambrotose Complex. Ambrotose is a proprietary blend of Manapol, a substance derived from the aloe vera plant, and other glyconutrients, which Mannatech contends support the immune system, the endocrine system and cell-to-cell communication. Ambrotose Complex is a key component in all but one of Mannatech's line of 30 products.

The ingredients in Ambrotose Complex are arabinogalactan (larix decidua gum), gum ghatti, gum tragacanth and, notably, Manapol aloe vera gel extract (inner-leaf gel).

The last-named ingredient, Manapol, is sold exclusively by Irving, Texas-based Carrington Labs (CARN), a company whose research for more than two decades has focused on the aloe vera plant. During that long span, as Barron's readers may well recall, Carrington has touted its aloe-based drugs as a cure for everything from cancer and AIDS to ulcerative colitis.

The gyrations in Carrington's stock have been spectacular -- in 1989-90, it bounced from $12 to $41 to $4; in '96, from $30 to $50 to $7. But, alas, Carrington's drugs, for all they induced bouts of speculative fever, were total duds as a treatment for AIDS, cancer or even colitis.

In only two of the past 10 years has Carrington been even marginally profitable. Its shares now fetch about $4, and arguably its most successful product is the aloe-based Manapol it supplies to Mannatech, which last year chipped in 47% of Carrington's sales.

The Carrington connection, however, goes beyond that of buyer-supplier. Some of Carrington's key scientists and execs have signed on with Mannatech and reaped very handsome rewards.

25

Eileen Vennum, who from 1988 to '96 was Carrington's director of regulatory affairs, is today a senior vice president of R&D at Mannatech. Bill McAnalley, who from '87 to '95 was a V.P. of R&D at Carrington, is today Mannatech's chief science officer.

Reginald McDaniel, who as a consultant did studies on aloe-based compounds for Carrington, served as Mannatech's medical director from '96 to '02. After Mannatech's IPO, he owned more than 500,000 shares, which today would be worth $10 million.

Last December, when Mannatech shares were trading around $20, McDaniel B no longer on the payroll -- was allowed to buy 180,000 shares directly from chief exec Sam Caster at $2.66 a share. On paper, it was a tidy $3 million bequest. The sale, says Caster, was to enable McDaniel to "pursue his ongoing passion for the research of glyconutrients."

An upbeat Texan with a bit of drawl, the 54-year-old Caster credits McAnalley and McDaniel with having "pioneered the science of glycomics."

"Glyco" is the Greek word for sugar, he explains, not the sweet kind, sucrose, but rather sugars that come from plants, like mannose from the aloe vera. With its "significant patents," Mannatech is on the forefront of a "brand new area of nutrition," Caster insists. But while Mannatech does have some foreign patents, in the U.S., according to the 10-K, it "continues to face the risk of its patent protection for Ambrotose complex being ultimately denied."

Unlike Carrington, which wanted to market its products as drugs and suffered devastating rebuffs by the Food and Drug Administration. **Mannatech is selling Ambrotose only as a food supplement and so needs no blessing from regulators. However, the company is strictly prohibited from claiming Ambrotose "treats" or "cures" anything. Moreover, the Federal Trade Commission requires Mannatech to have "adequate substantiation" for its claims, meaning they must be based on "competent and reliable scientific evidence."**

**Associates receive clear guidelines about what they can claim, Caster asserts, and the company disciplines or dismisses those who break the rules.**

26

**Yet even the most cursory visit to the Websites of Mannatech associates reveals that these sites are replete with the most astonishing of claims. For example, one such Website, with no readily visible disclaimer, tells with graphic visuals and somewhat primitive prose the remarkable story of Jaclyn, a young woman suffering from multiple sclerosis. She is shown first sitting in a wheelchair and then, in a second photo, working out on a treadmill.**

The text accompanying those starkly contrasting photos reads: "Shortly after being married, Jaclyn was faced with the greatest challenge of her life. The excitement of being a newlywed was soon drowned out by the confinement to a wheelchair....A friend introduced her to glyconutrients....To everyone's amazement, Jaclyn became the fastest response to glyconutrients of anyone who has tried them with MS. The restoration of health usually takes several months with such a debilitating condition. For Jaclyn, within two weeks she was walking again."

Or jump to another Website and learn about Rikkea. born with cerebral palsy. The pitch comes presumably from her parents: "Our six-year-old daughter Rikkea could not walk or speak at the age of two due to brain damage caused by cerebral palsy....She was having seizures, constant drooling from the mouth....We were introduced to and gave her two capsules of glyconutrients a day in December 1998. After only one week, she got up and walked around the house!! She soon began speaking clearly in sentences too!!"

**Close inspection of this site turns up a disclaimer, in small print, to the effect that the statements made have not been evaluated by the FDA and that Mannatech products are dietary supplements not intended to treat disease. But perhaps worth noting, this demur comes after pages and pages of testimonials about the remarkable effects of glyconutrients on a vast array of diseases, including arthritis, hepatitis, brain cancer, diabetes, subglottic hemangioma, prostate cancer and toxic-shock syndrome.**

Here, as on a good many other associates' sites. people also can get info on the "amazing opportunity" to sell Mannatech's supplements. Such sites do double duty. by both selling the products and also recruiting foot soldiers for Mannatech's sales force.

The promotional spiel on this associate's site begins: "Think about this. If there is a product that could benefit every person on earth, is scientifically validated, is new, is essential like vitamins, is patented, and is only available from ONE company that has an upward business growth compared to that of Microsoft, that equates to a very significant opportunity." Bill Gates, are you listening?

**In spite of flagrant flouting of the rules by salespeople, Mannatech maintains that it complies with applicable laws and regulations. Caster makes a sharp distinction between the company and its associates, conceding that from time to time the latter may make improper claims. "We're enforcing our policies," he insists, "but there's only so much we can do."**

The seemingly irrepressible inclination of some Mannatech associates to make extraordinary therapeutic claims for the supplements has irked some foreign regulators. In New Zealand, the Medical Devices Safety Authority notified Mannatech that its salespeople were making unwarranted claims after newspaper articles in early 2003 described how Stephen Nugent, a Mannatech employee with Ph.D.s in psychology and "naturopathic medicine," had extolled the virtues of the supplements before packed crowds in several cities.

Speaking to some 500 people in an Auckland ballroom, Nugent is reported to have referred repeatedly to breast and child cancer, cited medical studies supporting the company's theories and implied he could be more specific except for fear of running afoul of the government and its regulatory bodies

In addition, the New Zealand Press Association reported that Mannatech associates were allegedly claiming the supplements could treat HIV, cancer, cystic fibrosis, arthritis and Down syndrome.

Mannatech addressed the complaints from the New Zealand Medical Devices Safety Authority through its in-house "disciplinary procedure" and, as of last June, according to the 10-K, had satisfied the regulators.

In Australia, the Therapeutic Goods Administration continues to monitor the company and has required Mannatech to provide "compliance training" for associates for the next three years.

28

Symptomatic of what may have prompted such oversight were some dubious practices by a Mannatech associate, whose medical license was cancelled for two years in 2000 by the Australian Health Practitioner's Tribunal. According to the tribunal's report of its disciplinary action, the doctor, Ian Raddatz, who together with his wife had a sideline business selling Mannatech products, had told patients that the supplements could treat infertility, brain damage and cancer; had urged patients to use Mannatech supplements instead of their prescribed medications, and had tried to recruit a cancer patient's daughter as an associate, telling her: "These wonderful pills will...work wonders on your mother's cancer."

Even more egregious are the allegations at the heart of a lawsuit filed Nov. 1, 2004, in a Los Angeles Superior Court by Chie Sasaki, mother of a child with Tay-Sachs disease. She accuses a Mannatech associate, Caster and Mannatech itself of, among other things, intentional infliction of emotional distress, negligent misrepresentation and conspiracy to commit fraud.

The charges stem from the alleged actions of a Mannatech associate and Sherman Oaks chiropractor, Victoria Arcadi, who treated Sasaki's son, Yasuhiro, after he was diagnosed with Tay-Sachs, a fatal ailment most common among Ashkenazi Jews. Arcadi has denied all the charges against her.

According to court papers, after an initial chiropractic exam in September 1996, Arcadi recommended that Sasaki's son, then three years and nine months old, be given Mannatech supplements. His mother added them to a complicated diet she was already feeding him based on a high-calorie soy-based formula. By being fed nine times a day, the boy managed to gain several pounds.

His mother subsequently gave Arcadi pictures of the boy to show his weight gain, solely for the purpose of his treatment and expecting them to be kept confidential. Yet without oral or written consent, the complaint continues, in May 1997 Arcadi showed photographs of a naked Yasuhiro to several hundred people at a Mannatech demonstration seminar.

A month later, when Yasuhiro's mother discovered her son's photos were being widely used at Mannatech sales meetings, she fired off a letter of protest directly to Samuel Caster, then Mannatech's president. According to the complaint, Mannatech and Caster denied responsibility.

29

In July 1997, the complaint continues, Yasuhiro's mother protested, on three separate occasions, to Arcadi, who, promised to protect Yasuhiro's privacy but did not return the photographs as requested.

A month later, Arcadi co-authored an article entitled "Case Study: Tay-Sachs Disease Improvement During Nutritional Supplementation" in the Journal of the American Nutraceutical Association, featuring Yasuhiro Sasaki and describing his dramatic improvement taking Mannatech supplements. Thanks apparently to the supplements, the authors reported, "the child is interacting with his environment and exhibiting physical and vocal communication."

Yet, according to the complaint, when the article was published in August 1997, Yasuhiro Sasaki was already dead.

After his death, his mother again demanded Mannatech, Caster and Arcadi stop using her son's likeness and story in marketing Mannatech products, and, according to the complaint, she was led to believe the objectionable distribution would stop.

But years later -- in March 2004, to be precise -- she received an e-mail from a woman in Mexico whose nephew was afflicted with Tay-Sachs. The woman had seen photographs depicting Yasuhiro's purported improvement using Mannatech products on a current Website, "with the clear inference," according to the complaint, "that Yasuhiro was alive and doing well some seven years after his actual death."

**Caster adamantly denies that he or Mannatech had anything to do with distributing Yasuhiro's story or his photographs. "As a company, we never used the pictures," he stresses. But he concedes that some associates might still be using Yasuhiro's story and photos. "Once they get out there," he observes, "it's impossible to get them back."**

So far, anyway, neither regulatory disapproval abroad nor wildly hyperbolic claims by associates on their Websites here have dampened the ardor of Mannatech users and associates (who often overlap) or slowed the company's vigorous growth.

30

> And shareholders, as noted, have little reason to be displeased. Especially those shareholders who happen to be insiders. In the past 12 months, seven Mannatech insiders have sold more than 900,000 shares worth $18 million.
>
> Two of the biggest sellers were Eileen Vennum and Bill McAnalley. Specifically, in just the past six months, Vennum sold over 85,000 shares worth more than $1.8 million; McAnalley sold 259,000 shares worth a cool $5.5 million.
>
> Vennum is senior vice president of R&D at Mannatech. McAnalley is chief science officer, the company's R&D honcho. They are, pure and simple, Mannatech's top scientists, both named as inventors on a U.S. patent that is pending for Ambrotose Complex.
>
> Nothing amiss in their selling stock, of course. But to a cynical eye, that they have sold in such quantity could easily be taken as hedging their bets.

[Emphasis added.]

42.     The *Barron's* article shocked the market. The disclosure of the unfounded and unsubstantiated claims made by Mannatech associates about the health benefits of the Company's products caused Mannatech shares to plummet more than 26% in one day, to close at $15.11 per share on May 9, 2005, the same day that the *Barron's* article appeared. The following day, Mannatech shares fell another 19.59%, to close on May 10, 2005 at $12.15 per share.

## UNDISCLOSED ADVERSE FACTS

43.     The market for Mannatech common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Mannatech common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Mannatech common

stock relying upon the integrity of the market price of Mannatech common stock and market information relating to Mannatech, and have been damaged thereby.

44.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Mannatech common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, operations and prospects, as alleged herein.

45.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Mannatech's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Mannatech and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

32

## LOSS CAUSATION

46.     Defendants' wrongful conduct, as alleged herein. directly and proximately caused the damages suffered by plaintiff and the Class.

47.     During the Class Period. plaintiff and the Class purchased securities of the Company at artificially inflated prices and were damaged thereby. Defendants' omissions and misrepresentations. as alleged herein. caused plaintiffs and the Class substantial losses when the foreseeable risks that were concealed by defendants were subsequently disclosed to the market and caused the value of the Company's securities to decline, thereby damaging plaintiff and the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

48.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading: knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail. defendants, by virtue of their receipt of information reflecting the true facts regarding Mannatech, their control over, and/or receipt and/or modification of Mannatech's allegedly materially misleading misstatements. and/or

33

their associations with the Company which made them privy to confidential proprietary informa-

tion concerning Mannatech, participated in the fraudulent scheme alleged herein.

49.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of

the information which they caused to be disseminated to the investing public.  The ongoing

fraudulent scheme described in this complaint could not have been perpetrated over a substantial

period of time, as has occurred, without the knowledge and complicity of the personnel at the

highest level of the Company, including the Individual Defendants.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

50.    At all relevant times, the market for Mannatech's common stock was an efficient

market for the following reasons, among others:

(a)    Mannatech stock met the requirements for listing, and was listed and

actively traded on the Nasdaq, a highly efficient and automated market;

(b)    As a regulated issuer, Mannatech filed periodic public reports with the SEC

and the Nasdaq;

(c)    Mannatech regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services.

34

51.   As a result of the foregoing, the market for Mannatech common stock promptly digested current information regarding Mannatech from all publicly-available sources and reflected such information in Mannatech's stock price. Under these circumstances, all purchasers of Mannatech's common stock during the Class Period suffered similar injury through their purchase of Mannatech common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Mannatech who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

53.    Plaintiff incorporates ¶¶1-52 as if fully set forth herein.

54.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Mannatech common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Mannatech common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

36

continuous course of conduct to conceal adverse material information about the business,

operations and future prospects of Mannatech as specified herein.

57.    These defendants employed devices, schemes, and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Mannatech's value and performance

and continued substantial growth, which included the making of, or the participation in the making

of, untrue statements of material facts and omitting to state material facts necessary in order to

make the statements made about Mannatech and its business operations and future prospects in

the light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated

as a fraud and deceit upon the purchasers of Mannatech common stock during the Class Period.

58.    The Individual Defendant's primary liability, and controlling person liability, arises

from the following facts: (i) the Individual Defendant was a high-level executive and director at the

Company during the Class Period and a member of the Company's management team or had

control thereof; (ii) the Individual Defendant, by virtue of his responsibilities and activities as a

senior officer and/or director of the Company was privy to and participated in the creation,

development and reporting of the Company's internal budgets, plans, projections and/or reports;

(iii) the Individual Defendant enjoyed significant personal contact and familiarity with the other

defendant and was advised of and had access to other members of the Company's management

team, internal reports and other data and information about the Company's finances, operations,
and sales at all relevant times; and (iv) the Individual Defendant was aware of the Company's
dissemination of information to the investing public which he or she knew or recklessly
disregarded was materially false and misleading.

59.     The defendants had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth in that they failed to
ascertain and to disclose such facts, even though such facts were available to them. Such
defendants' material misrepresentations and/or omissions were done knowingly or recklessly and
for the purpose and effect of concealing Mannatech's operating condition and future business
prospects from the investing public and supporting the artificially inflated price of its common
stock. As demonstrated by defendants' overstatements and misstatements of the Company's
business, operations and earnings throughout the Class Period, defendants, if they did not have
actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain
such knowledge by deliberately refraining from taking those steps necessary to discover whether
those statements were false or misleading.

60.     As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market price of Mannatech common
stock was artificially inflated during the Class Period. In ignorance of the fact that market prices
of Mannatech's publicly-traded common stock were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period. Plaintiff and the other members of the Class acquired Mannatech's common stock during the Class Period at artificially high prices and were damaged when the material adverse information concealed by defendants was disclosed to the market and caused Mannatech's share price to decline.

61.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Mannatech was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Mannatech common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period. Defendants' omissions and

misrepresentations, as alleged herein, caused plaintiffs and the Class substantial losses when the foreseeable risks that were concealed by defendants were subsequently disclosed to the market and caused the value of the Company's securities to decline. thereby damaging plaintiffs and the Class.

## SECOND CLAIM
### Violation Of Section 20(a) Of The Exchange Act
### Against the Individual Defendants

64.   Plaintiff incorporates ¶¶1-63 as if fully set forth herein.

65.   The Individual Defendants acted as controlling persons of Mannatech within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights. participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public. the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly. the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports. press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

40

66.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.    As set forth above, Mannatech and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

68.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period. The Individual Defendants' omissions and misrepresentations, as alleged herein, caused plaintiffs and the Class substantial losses when the foreseeable risks that were concealed by defendants were subsequently disclosed to the market and caused the value of the Company's securities to decline, thereby damaging plaintiffs and the Class.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

41

1.      Determining that this action is a proper class action, designating Plaintiff as

Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules

of Civil Procedure and Plaintiff's counsel as Lead Counsel;


2.      Awarding compensatory damages in favor of Plaintiff and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of

defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 1st, 2005                           RON BELL & ASSOCIATES

                                                  By:_____
                                                  Raynard Struck
                                                  610 7th Street NW
                                                  Albuquerque, NM 87102
                                                  Telephone:      (505) 242-7979
                                                  Facsimile:      (505) 243-7192

                                                  **GLANCY BINKOW & GOLDBERG LLP**
                                                  Lionel Z. Glancy
                                                  Michael Goldberg
                                                  1801 Avenue of the Stars, Suite 311
                                                  Los Angeles, California 90067
                                                  Telephone:      (310) 201-9150

                                                  42

**MURRAY FRANK & SAILER LLP**
Eric Belfi
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone:     (212) 682-1818
Facsimile:     (212) 682-1892

**SMITH & SMITH LLP**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020
Telephone:     (215) 638-4847
Facsimile:     (215) 638-4867

*Attorneys for Plaintiff*

43

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**MANNATECH, INC. SECURITIES LITIGATION**

I, JONATHAN CROWELL, certify that:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase MANNATECH, INC., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in MANNATECH, INC. during the Class Period set forth in the Complaint are as follows:

I bought 246 shares on 03/10/05  at $ 22.6859  per share
I bought 464 shares on 03/10/05  at $ 22.6859  per share

I sold 246 shares on 03/10/05  at $ 22.1983  per share
I sold 464 shares on 03/10/05  at $ 22.1983  per share

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 7-20-05                              _Jonathan Crowell_
                                            JONATHAN CROWELL,